**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE INTERCEPT MEDIA, INC., | |
| Plaintiff, | |
| -against- | Case No. 25 Civ. 2404 (VSB)(OTW) |
| UNITED STATES DEPARTMENT OF GOVERNMENT EFFICIENCY, a/k/a UNITED STATES DOGE SERVICE and UNITED STATES DIGITAL SERVICE, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS THE COMPLAINT**

JAY CLAYTON
United States Attorney for the
Southern District of New York
*Attorney for Defendants*

SARAH S. NORMAND
Assistant United States Attorney
            *-Of Counsel*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT..................................................................................................1

BACKGROUND ....................................................................................................................2

      A.     The Establishment of USDS and Its Limited Advisory Responsibilities ...............2

      B.     Procedural History......................................................................................................6

ARGUMENT – THE COURT SHOULD DISMISS THE COMPLAINT BECAUSE
PLAINTIFF FAILS TO PLAUSIBLY ALLEGE THAT USDS IS AN "AGENCY" SUBJECT
TO FOIA ..............................................................................................................................8

      A.     EOP Units That Lack Substantial Authority to Act Independent of
            the President, Whose Sole Purpose Is Instead to Advise or Assist the President,
            Are Not "Agencies" Under FOIA........................................................................9

      B.     The USDS's Charter Documents Do Not Demonstrate Intent to Delegate the
            President's Own Authority to USDS......................................................................13

      C.     Plaintiff Misplaces Reliance on the *CREW v. USDS* Decision ............................17

CONCLUSION....................................................................................................................26

# TABLE OF AUTHORITIES

*Cases*

*American Federation of Labor & Congress of Industrial Organizations v. Department of Labor*
__ F. Supp. 3d __, 2025 WL 542825 (D.D.C. Feb. 14, 2025)....................................................... 18

*Armstrong v. EOP*,
90 F.3d 553 (D.C. Cir. 1996) ........................................................................................................ 10

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................................................................ 8

*CREW v. Office of Admin.*,
566 F.3d 219 (D.C. Cir. 2009) ........................................................................................... 10, 13, 16

*CREW v. USDS,*
__ F. Supp. 3d __, 2025 WL 752367 (D.D.C. Mar. 10, 2025)............................................. passim

*CREW v. USDS*
25-cv-511 (CRC), 2025 WL 863947 (D.D.C. Mar. 19, 2025) ...................................................... 18

*Department of Justice v. Tax Analysts*,
492 U.S. 136 (1989) ........................................................................................................................ 8

*Kissinger v. Reporters Comm. for Freedom of the Press*,
445 U.S. 136 (1980) ..................................................................................................................... 8, 9

*Main Street Legal Servs., Inc. v. NSC*,
811 F.3d 542 (2d Cir. 2016)................................................................................................. passim

*Marin Audubon Society v. FAA*,
121 F.4th 902 (D.C. Cir. 2024) .................................................................................................... 17

*Meyer v. Bush*,
981 F.2d 1288 (D.C. Cir. 1993) ...................................................................................9, 10, 11, 12

*Pacific Legal Foundation v. Council on Environmental Quality*,
636 F.2d 1259 (D.C. Cir. 1980) ................................................................................................... 17

*Rushforth v. Council of Economic Advisers*,
762 F.2d 1038 (D.C. Cir. 1985) ................................................................................................... 10

*Sierra Club v. Andrus*,
581 F.2d 895 (D.C. Cir. 1978) ............................................................................................... 16, 17

ii

*Soucie v. David*,
   448 F.2d 1067 (D.C. Cir. 1971) ........................................................................ passim

**Statutes**

5 U.S.C. § 3161 ........................................................................................................... 2

5 U.S.C. § 551(1) ...................................................................................................... 12

5 U.S.C. § 552 ........................................................................................................ 1, 8

5 U.S.C. § 552(a)(4)(B) ............................................................................................ 8,

5 U.S.C. § 552(f) ........................................................................................................ 9

31 U.S.C. § 101 ....................................................................................................... 25

42 U.S.C. § 4342 .................................................................................................... 17

42 U.S.C. § 6612 .................................................................................................... 17

44 U.S.C. § 2201 .................................................................................................. 7, 8

44 U.S.C. § 2201(2)(B) ............................................................................................ 8

**Rules**

Federal Rule of Civil Procedure 12(b)(6) ...................................................... 2, 8, 12, 26

**Executive Orders and Presidential Memoranda**

Executive Order 14,158, 90 Fed. Reg. 8441 (Jan. 20, 2025) ................................. passim

Executive Order 14,170, 90 Fed. Reg. 8621 (Jan. 20, 2025) ......................... 3, 4, 14, 15

Executive Order 14,210, 90 Fed. Reg. 9669 (Feb. 11, 2025) ......................... 4, 15, 21

Executive Order 14,218, 90 Fed. Reg. 10,581 (Feb. 19, 2025) ....................... 5, 15

Executive Order 14,219, 90 Fed. Reg. 10,583 (Feb. 19, 2025) ....................... 5

Executive Order 14,222, 90 Fed. Reg. 11,095 (Feb. 26, 2025) ....................... 5, 15

Presidential Memorandum, *available at* https://www.whitehouse.gov/presidential-
   actions/2025/01/hiring-freeze/ ...................................................................... 6, 16

**Other Authorities**

H.R. Conf. Rep. No. 1380 ............................................................................................................ 9

S. Conf. Rep. No. 1200 .............................................................................................................. 9

1974 U.S.C.C.A.N. 6285 ...................................................................................................... 9, 10

**Preliminary Statement**

Plaintiff The Intercept Media, Inc. brought this lawsuit to compel defendants the United States Department of Government Efficiency "a/k/a United States DOGE Service" and the United States Digital Service (collectively, "USDS") to produce records under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. The complaint should be dismissed because Plaintiff fails to plausibly allege that USDS is an "agency" subject to FOIA.

Under Second Circuit law, a unit of the Executive Office of the President ("EOP") is not a FOIA agency unless its charter documents make clear that it does more than advise and assist the President, and instead has been delegated substantial authority to act independently of the President. And as the Second Circuit has instructed, "a due regard for separation of powers" requires that courts exercise both "caution" and "a respectful measure of deference to the President's own statements of intent" when "assessing a claim that the nation's Chief Executive has so conveyed his authority to another person or entity that it can now be exercised independent of him." *Main Street Legal Servs., Inc. v. NSC*, 811 F.3d 542, 557-58 (2d Cir. 2016). There is no indication in the Executive Orders or presidential memorandum establishing USDS and assigning its functions that President Trump intended to delegate to USDS his own authority to act. Instead, USDS's charter documents demonstrate that it has been assigned limited, purely advisory and consultative responsibilities that are distinct from the duties of the "DOGE Teams" that operate within agencies (and are subject to FOIA).

Plaintiff places significant weight on a preliminary ruling of a district court in the District of Columbia, which found that the FOIA requestor in that case had shown a likelihood of success on the issue of USDS's status. But that court, which decided the issue in an expedited posture without the benefit of adversarial briefing, misinterpreted the Executive Order establishing

USDS and failed to exercise the caution and deference required under Second Circuit law.  This Court is not bound by, and should not follow, that erroneous ruling.  Rather, because Plaintiff has not met its burden to plausibly allege that USDS is an agency, the Court should dismiss the Plaintiff's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

## BACKGROUND

### A.    The Establishment of USDS and Its Limited Advisory Responsibilities

Shortly after President Trump took office on January 20, 2025, he signed a series of Executive Orders and a presidential memorandum concerning his "Department of Government Efficiency" ("DOGE") agenda.

*Executive Order 14,158*:  On January 20, 2025, President Trump signed Executive Order 14,158, *Establishing and Implementing the President's "Department of Government Efficiency*." The Executive Order directed changes to the previously established United States Digital Service in order to implement the President's "DOGE Agenda" of "improv[ing] the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems."  90 Fed. Reg. 8441, § 4.  This Executive Order both reorganized and renamed the United States Digital Service.  The Order redesignated the United States Digital Service as the U.S. DOGE Service.  *Id*. § 3(a).  The Order also moved the United States Digital Service out of the Office of Management and Budget ("OMB") and made it a free-standing component of the EOP reporting directly to the White House Chief of Staff.  *Id*. § 3(b).  In addition, Executive Order 14,158 established a "U.S. DOGE Service Temporary Organization" within USDS pursuant to 5 U.S.C. § 3161, which will terminate on July 4, 2026.  *Id*.  "The U.S. DOGE Service Temporary Organization shall be headed by the USDS Administrator and shall be dedicated to advancing the President's 18-month DOGE agenda."  *Id*.

Executive Order 14,158 expressly distinguishes between USDS and other EOP components, on the one hand, and "Agencies" on the other. The term "Agency" in the Order explicitly excludes "the Executive Office of the President or any components thereof," including USDS. *Id.* §§ 2(a), 3(a). Under Executive Order 14,158, "[i]n consultation with USDS, each Agency Head shall establish within their respective Agencies a DOGE Team of at least four employees, which may include Special Government Employees, hired or assigned within thirty days" of the Order. *Id.* § 3(c). "Each DOGE Team will typically include one DOGE Team Lead, one engineer, one human resources specialist, and one attorney." *Id.* The Executive Order directs Agency Heads to select the DOGE Team members "in consultation with the USDS Administrator," and to "ensure that DOGE Team Leads coordinate their work with USDS and advise their respective Agency Heads on implementing the President's DOGE Agenda." *Id.*

Section 4 of Executive Order 14,158 tasks the USDS Administrator with "commenc[ing] a Software Modernization Initiative to improve the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems." *Id.* § 4(a). The Order directs Agency Heads to "take all necessary steps, in coordination with the USDS Administrator and to the maximum extent consistent with law, to ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems," while also directing that "USDS shall adhere to rigorous data protection standards." *Id.* §§ 4(b). In other words, Agency DOGE Teams composed of agency personnel who are selected by agency leadership and report up agency supervisory chains "take all necessary steps" within their agencies and "coordinat[e]" with USDS on the President's "DOGE Agenda." *Id.* §§ 1, 3(c), 4(b).

*Executive Order 14,170*: Also on January 20, President Trump signed Executive Order 14,170, *Reforming the Federal Hiring Process and Restoring Merit to Government Service*, 90

Fed. Reg. 8621 (Jan. 20, 2025).  That Executive Order directs the Assistant to the President for Domestic Policy, "in consultation with" the Director of OMB, the Director of the Office of Personnel Management ("OPM"), and the USDS Administrator, to "develop and send to agency heads a Federal Hiring Plan that brings to the Federal workforce only highly skilled Americans dedicated to the furtherance of American ideals, values, and interests."  *Id*. § 2(a).  Executive Order 14,170 states that the resulting federal hiring plan "shall provide specific best practices for the human resources function in each agency, which each agency head shall implement, with advice and recommendations as appropriate" from USDS.  *Id*. § 2(d).

*Executive Order 14,210*:  On February 11, President Trump issued Executive Order 14,210, *Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative*, 90 Fed. Reg. 9669 (Feb. 11, 2025).  That Executive Order directs the OMB Director to "submit a plan to reduce the size of the Federal Government's workforce through efficiency improvements and attrition," *id*. § 3(a), and directs Agency Heads, among other things, to "promptly undertake preparations to initiate large-scale reductions in force," *id*. § 3(c).

Executive Order 14,210 tasks each "DOGE Team Lead," defined as "the leader of the Department of Government Efficiency (DOGE) Team at each agency, as defined in Executive Order 14158," *id*. § 2(c), with several limited responsibilities.  First, the DOGE Team Lead consults with each Agency Head on establishing a hiring plan.  *See id*. § 3(b) ("Each Agency Head shall develop a data-driven plan, in consultation with its DOGE Team Lead, to ensure new career appointment hires are in highest-need areas.").  Second, under the hiring plan, "new career appointment hiring decisions shall be made in consultation with the agency's DOGE Team Lead, consistent with applicable law."  *Id*. § 3(b)(i).  Third, "[t]he agency shall not fill any vacancies

4

for career appointments that the DOGE Team Lead assesses should not be filled, unless the Agency Head determines the positions should be filled." *Id*. § 3(b)(ii).  And fourth, "[e]ach DOGE Team Lead shall provide the United States DOGE Service [USDS] Administrator with a monthly hiring report for the agency." *Id*. § 3(b)(iii).

*Executive Order 14,218*:  On February 19, 2025, President Trump issued Executive Order 14,218, *Ending Taxpayer Subsidization of Open Borders*, 90 Fed. Reg. 10,581 (Feb. 19, 2025). That Executive Order directs the Director of OMB and the Administrator of USDS, in coordination with the Assistant to the President for Domestic Policy, to "identify all other sources of Federal funding for illegal aliens," and to "recommend additional agency actions to align Federal spending with the purposes of this order, and, where relevant, enhance eligibility verification systems." *Id*. § 2(b)(i)-(ii).

*Executive Order 14,219*:  The same day, President Trump also issued Executive Order 14,219, *Ensuring Lawful Governance and Implementing the President's "Department of Government Efficiency" Deregulatory Initiative*, 90 Fed. Reg. 10,583 (Feb. 19, 2025).  That Executive Order directs that "Agency heads shall, in coordination with their DOGE Team Leads and the Director of [OMB], initiate a process to review all regulations subject to their sole or joint jurisdiction for consistency with law and Administration policy," and identifies certain classes of regulations that Agency heads must identify.  *Id*. § 2(a).  "Additionally, agency heads shall consult with their DOGE Team Leads and the Administrator of [the Office of Information and Regulatory Affairs] on potential new regulations as soon as practicable." *Id*. § 4.  This Executive Order does not mention USDS or assign any duties to it.

*Executive Order 14,222*:  Executive Order 14,222, *Implementing the President's "Department of Government Efficiency" Cost Efficiency Initiative*, 90 Fed. Reg. 11,095 (Feb. 26,

2025), states that "[e]ach Agency Head shall, with assistance as requested from the agency's DOGE Team Lead, build a centralized technological system within the agency to seamlessly record every payment issued by the agency pursuant to the agency's covered contracts and grants," among other steps.  *Id*. § 3(a); *see also id*. §§ 3(a)(i), (3)(b), 3(c), 3(d)(i) (identifying additional steps to be taken by Agency heads in consultation with the agency's DOGE Team Lead).  The Executive Order also directs each DOGE Team Lead to provide the USDS Administrator with "a monthly informational report on contracting activities," *id*. § 3(d)(ii), and, "to the extent consistent with law, provide the Administrator with a monthly informational report listing each agency's justifications for non-essential travel," *id*. § 3(e).[1]

*Hiring Freeze Presidential Memorandum*:  In addition to these Executive Orders, a January 20, 2025 presidential memorandum directs the OMB Director, "in consultation with" the OPM Director and the USDS Administrator, to "submit a plan to reduce the size of the Federal Government's workforce through efficiency improvements and attrition."  Presidential Memorandum, *Hiring Freeze*, available at https://www.whitehouse.gov/presidential-actions/2025/01/hiring-freeze/.  The memorandum states that the hiring freeze the memorandum directs shall remain in place for the Internal Revenue Service ("IRS") "until the Secretary of the Treasury, in consultation with the Director of OMB and the Administrator of USDS, determines that it is in the national interest to lift the freeze."  *Id*.

### B.    Procedural History

Between March 5 and March 14, 2025, Plaintiff's newsroom counsel and correspondent Shawn Musgrave submitted five FOIA requests, by email to various individuals with a

---

[1] USDS and its Administrator's responsibilities are sometimes supplemented by Executive Order, but all of its responsibilities are purely advisory and consultative.

"doge.eop.gov" email address, each seeking disclosure of certain records. *See* ECF No. 1

("Compl.") ¶¶ 3, 50-51 & n.16, 58-69 & Exhs. A-E (the "FOIA Requests"). USDS responded to

the FOIA Requests on March 18, 2025. Compl. ¶¶ 4, 70-71 & Exh. F. USDS explained that,

"[a]s set forth in Executive Order 14158, Establishing and Implementing the President's

'Department of Government Efficiency,' USDS sits within the Executive Office of the President,

and the USDS Administrator reports to the President's Chief of Staff." Compl. Exh. F. USDS

informed Mr. Musgrave that "USDS is subject to the Presidential Records Act, 44 U.S.C.S.

§ 2201 et seq.[,] and is not subject to FOIA." *Id.* USDS therefore denied the FOIA Requests.

Compl. Exh. F.

      Plaintiff filed this lawsuit on March 24, 2025, naming as defendants the United States

Department of Government Efficiency "a/k/a United States DOGE Service" and the United

States Digital Service. Compl. Caption & ¶ 44.[2] Plaintiff alleges that Defendants are "agencies"

within the meaning of FOIA, Compl. ¶ 44, and claims that their refusal to make the requested

records available violates FOIA, Compl. ¶ 76. The Complaint seeks injunctive and declaratory

relief to confirm that Defendants are subject to FOIA, to compel them to release records in

response to the FOIA Requests, and to require them to preserve all potentially responsive

records. *Id.* ¶¶ 77-78 & Prayer for Relief.

---

[2] Executive Order 14,158 reorganized the U.S. Digital Service and renamed it "the United States
DOGE Service (USDS)." Accordingly, this brief refers to Defendants collectively as "USDS."

## ARGUMENT

## THE COURT SHOULD DISMISS THE COMPLAINT BECAUSE PLAINTIFF FAILS TO PLAUSIBLY ALLEGE THAT USDS IS AN "AGENCY" SUBJECT TO FOIA

"FOIA applies only to federal agencies." *Main Street Legal Services*, 811 F.3d at 546. The statute requires that "[e]ach agency" make available to the public non-exempt agency records, 5 U.S.C. § 552, and "confers jurisdiction on the district courts 'to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld.'" *Department of Justice v. Tax Analysts*, 492 U.S. 136, 142 (1989) (quoting 5 U.S.C. § 552(a)(4)(B)); *see also Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 150 (1980) ("federal jurisdiction [under FOIA] is dependent upon a showing that an agency has (1) 'improperly'; (2) 'withheld'; (3) 'agency records'").[3]

Whether or not an entity is an "agency" subject to FOIA is properly resolved on a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Main Street Legal Services*, 811 F.3d at 566-67; *see id.* at 544 ("the burden on that preliminary legal question rests with the party seeking production"). "Where, as here, the defendant is a unit within the Executive Office of the President," a plaintiff's "conclusory pleading of agency status [i]s insufficient." *Id.* at 567; *see Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009) ("conclusory" allegations and "bare assertions" "not entitled to be assumed true"). Instead, "[t]o state a claim for relief under 5 U.S.C. § 552(a)(4)(B), a plaintiff must plausibly allege, among other things, that the defendant is an agency subject to the FOIA." *Main Street Legal Services*, 811 F.3d at 567. Plaintiff fails to meet that burden here.

---

[3] Presidential records are subject to the Presidential Records Act ("PRA"). *See* 44 U.S.C. § 2201 *et seq.* The PRA specifies that its coverage and the coverage of FOIA are mutually exclusive. *See* 44 U.S.C. § 2201(2)(B).

### A. EOP Units That Lack Substantial Authority to Act Independent of the President, Whose Sole Purpose Is Instead to Advise or Assist the President, Are Not "Agencies" Under FOIA

In 1974, Congress amended FOIA to define the term "agency" to include:

> any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency.

5 U.S.C. § 552(f). Although the text references the "Executive Office of the President," the term "agency" does not include every component in that office, but only components that fall within the specified list items ("department," "corporation," or "other establishment"). An EOP component that does not qualify as a department, corporation, or establishment is not subject to FOIA.

The Conference Committee Report accompanying the 1974 amendments to FOIA, which added the reference to the "Executive Office of the President," explains that the term "Executive Office of the President" is "not to be interpreted as including the President's immediate personal staff or units in the Executive Office whose sole function is to advise and assist the President." S. Conf. Rep. No. 1200, 93d Cong., 2d Sess. 15 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6285, 6293; H.R. Conf. Rep. No. 1380, 93d Cong., 2d Sess. 14 (1974) (same). Citing this "unambiguous" legislative history, the Supreme Court held in *Kissinger v. Reporters Committee for Freedom of the Press* that the "'Executive Office' does not include the Office of the President," and that "'the President's immediate personal staff or units in the Executive Office whose sole function is to advise and assist the President' are not included within the term 'agency' under the FOIA." 445 U.S. at 156 (quoting H.R. Conf. Rep. No. 1380, 93d Cong., 2d Sess., at 15 (1974)), *quoted in Main Street Legal Services*, 811 F.3d at 546; *see also Meyer v. Bush*, 981 F.2d 1288, 1293 n.3 (D.C. Cir. 1993) (FOIA excludes "at least those approximately

400 individuals employed in the White House Office" who are the President's immediate personal staff).

The legislative history also makes clear that Congress intended to codify the D.C. Circuit's decision in *Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971). *See* 1974 U.S.C.C.A.N. at 6293 (stating that "[w]ith respect to the meaning of the term 'Executive Office of the President' the conferees intend the result reached in *Soucie v. David*, 448 F.2d 1067"); *Armstrong v. EOP*, 90 F.3d 553, 558 (D.C. Cir. 1996) ("That the Congress intended to codify *Soucie* is clear enough."); *accord Main Street Legal Services*, 811 F.3d at 547; *Meyer*, 981 F.2d at 1291. *Soucie* considered whether the Office of Science and Technology ("OST"), an EOP component now known as the Office of Science and Technology Policy ("OSTP"), was an "agency" subject to FOIA. The D.C. Circuit held that it was, because, beyond its duties of advising the President, OST also had the "independent function of evaluating federal [scientific] programs." 448 F.2d at 1075. When OST inherited that function from one of its predecessor organizations, the court noted, both Congress and the President contemplated that Congress would "retain control over information on federal programs accumulated by the OST, despite any confidential relation between the Director of the OST and the President." *Id*. OST was found to be a FOIA agency because it did not have the "sole function" of advising and assisting the President, and instead had "substantial independent authority in the exercise of specific functions." *Id*. at 1073. OST was covered by FOIA in light of its "independent authority to evaluate federal scientific research programs, initiate and fund research projects, and award scholarships." *CREW v. Office of Admin.*, 566 F.3d 219, 223 (D.C. Cir. 2009); *see also Rushforth v. Council of Economic Advisers*, 762 F.2d 1038, 1041 (D.C. Cir. 1985) ("OST could take direct action and thus was deemed to be

10

an administrative agency"); *Meyer*, 981 F.2d at 1292 ("OST was a FOIA agency precisely because it could act directly and independently beyond advising and assisting the President.").

As Plaintiff acknowledges, *see* Compl. ¶ 41, the seminal case in this Circuit addressing whether a unit of the EOP constitutes an "agency" subject to FOIA is *Main Street Legal Services v. NSC*, 811 F.3d 542 (2d Cir. 2016). In that case, the Second Circuit confirmed that "both the 'sole function' and 'substantial independent authority' prongs of the *Soucie* analysis" should be considered in evaluating the status of an EOP unit. *Id.* at 547. The court "emphasize[d]," however, that "the relevant *Soucie* inquiry is not whether an [EOP] entity enjoys a measure of discretion, or independence, in how it provides advice or assistance" to the President, as "[t]hat is true to some degree of most advisers and assistants." *Id.* at 554. "Rather, *Soucie* asks whether an entity does more than render advice and assistance to the President—whether it exercises authority independent of the President, particularly with respect to individuals or other parts of government." *Id.* at 554; *see also id.* at 558-59.

In the absence of any Congressional delegation of authority to a unit of the EOP, moreover, the Second Circuit made clear in *Main Street Legal Services* that courts should be wary of finding that a President has delegated his own authority to act. The Court instructed: "a due regard for separation of powers signals judicial caution in assessing a claim that the nation's Chief Executive has so conveyed his authority to another person or entity that it can now be exercised independent of him." 811 F.3d at 557-58. "This is not to suggest that the President can never delegate executive authority. But the President alone decides the extent and conditions of any delegation." *Id.* at 558. And the President "can revoke a delegation whenever he changes his mind or overrule any exercise with which he disagrees." *Id.* For these reasons, the Second Circuit was "skeptical as to whether a President can *ever* be said to have delegated his own

authority in a way that renders it truly independent of him." *Id.* (emphasis added) (citing *Meyer*, 981 F.2d at 1297 (noting even dissent's doubt that President "would ever delegate true independent authority to his cabinet," and reaching same conclusion with respect to task force composed in part of certain cabinet officials)).

The Second Circuit specifically contrasted the President's delegation of his own authority "with statutory grants of authority to executive departments or agencies, which flow from a source independent from the President." *Id.* at 558. Where there is a statutory grant of authority,

> Congress can confer authority beyond the President's own. In such circumstances, the President may still give directions to executive agencies, and he can usually fire a recalcitrant agency head. But he cannot take away the agency's statutory authority or exercise it himself. . . . Statutory grants therefore easily allow an entity within the executive branch to be deemed an "authority of the Government of the United States" that exercises power independent of the President.

*Id.* (quoting *Soucie*, 448 F.2d at 1073, which in turn quoted 5 U.S.C. § 551(1)). By contrast, "presidential delegations of authority may not warrant that conclusion," because they "may simply make the entity an extension of the President, a vehicle for assisting him in exercising his authority when he cannot do so in person." *Id.* The Court therefore instructed that, "[i]n assessing a claim that the President has so conveyed his authority as to allow it to be exercised independent of him, separation of powers further counsels a respectful measure of deference to the President's own statements of intent in taking the action at issue." *Id.* at 558.

Applying these principles in *Main Street Legal Services*, the Second Circuit affirmed the district court's dismissal under Federal Rule of Civil Procedure 12(b)(6) of a complaint alleging that the National Security Council ("NSC") was an "agency" under FOIA. *Id.* at 544. The NSC, unlike USDS here, was established by statute. Yet the Court found that the statutory provisions creating the Council itself, and certain parts of the NSC System, did not grant the NSC

substantial authority independent of the President.  *See id.* at 549-552, 554-57.  Instead, they assigned the NSC an advisory role, with additional "coordination" functions that involved no exercise of authority independent of the President.  *Id.* at 551-52.  The Court likewise found nothing in the presidential directive organizing the NSC System or related Executive Orders that "indicates any intent to transfer presidential authority so that it can be exercised independent of the President."  *Id.* at 558, 561-62.

Finally, the Court considered various "third-party reports" that, according to the plaintiff, suggested that the NSC System "does not function only to advise and assist the President but, rather, exercises authority independent of him."  *Id.* at 563.  The Court was "reluctant to locate 'authority' indicative of agency status in action unsupported by an identified legal grant from Congress or the President."  *Id.* at 563-64; *see also id.* at 565 (declining to "readily assume that any part of the NSC system has overreached its function").  But the Court found the cited actions "insufficient to demonstrate agency status in any event."  *Id.* at 564.  The Court thus found that the actions that the plaintiff attributed to the NSC System did not "raise a plausible inference of independent authority so as to make the NSC an agency subject to the FOIA."  *Id.* at 566.

### B.  The USDS's Charter Documents Do Not Demonstrate Intent to Delegate the President's Own Authority to USDS

Plaintiff similarly fails to plausibly allege that USDS is a FOIA "agency."  Plaintiff's conclusory allegations regarding USDS's status, *see* Compl. ¶¶ 29, 38, 44, are insufficient.  *Main Street Legal Services*, 811 F.3d at 567.  Instead, the Court must evaluate USDS's "charter documents," *id.* at 549 (quoting *CREW v. Office of Admin.*, 566 F.3d at 224), to determine whether the President has "so conveyed his authority to [USDS] that it can now be exercised independent of him," *id.* at 558-59.

13

The Executive Order establishing USDS makes clear that the President did no such thing. Executive Order 14,158 reorganized and renamed the United States Digital Service "as the United States DOGE Service (USDS)," and established it "in the Executive Office of the President." Exec. Order 14,158, § 3(a). The Order further established "a USDS Administrator in the Executive Office of the President who shall report to the White House Chief of Staff." *Id.* § 3(b). The Order explicitly distinguished USDS and the USDS Administrator, on the one hand, from "Agencies" (which are defined not to include the EOP or components thereof) and "DOGE Teams" within the respective Agencies, on the other. *Id.* §§ 2(a), 3(c).

Moreover, as the Executive Orders and presidential memorandum collectively demonstrate, USDS has a limited set of advisory responsibilities, none of which even arguably involves the authority to direct agencies or other components of the executive branch. Specifically, according to its charter documents, USDS has the following tasks and responsibilities:

- The USDS Administrator must commence a software modernization initiative and "work with Agency Heads to promote inter-operability between agency networks and systems, ensure data integrity, and facilitate responsible data collection and synchronization." Exec. Order 14,158, § 4(a).

- The USDS Administrator should, "to the maximum extent consistent with law," have "full and prompt access to all unclassified agency records, software systems, and IT systems." *Id.* § 4(b).

- USDS may provide "advice and recommendations as appropriate" concerning implementation of the federal hiring plan developed by the Assistant to the President for Domestic Policy. Exec. Order 14,170, § 2(d).

14

- USDS receives monthly hiring reports from each DOGE Team Lead.  Exec. Order 14,210, § 3(b)(iii).

- The Administrator of USDS, with the OMB Director and in coordination with the Assistant to the President for Domestic Policy, is directed to identify sources of federal funding for illegal aliens and make various recommendations.  Exec. Order 14,218, § 2(b)(i)-(ii).

- USDS receives from each Agency DOGE Team Lead "a monthly informational report on contracting activities," Exec. Order 14,222, § 3(d)(ii), as well as, "to the extent consistent with law," "a monthly informational report listing each agency's justifications for non-essential travel," *id*. § 3(e).

In addition, according to the charter documents, agencies and other entities are directed to "coordinate" or "consult" with USDS as follows:

- Agency Heads are directed to establish an Agency DOGE Team within their respective Agencies "in consultation with USDS," and to select DOGE Team members "in consultation with the USDS Administrator."  Exec. Order 14,158, § 3(c).

- Agency DOGE Teams—which are employees of the respective agencies—are tasked generally with "coordinat[ing] their work with USDS," while "advis[ing] their respective Agency Heads on implementing the President's DOGE Agenda."  *Id.* § 3(c).

- The Assistant to the President for Domestic Policy is directed to develop a federal hiring plan "in consultation with" the USDS Administrator (as well as the Directors of OMB and OPM).  Exec. Order 14,170, § 2(a).

- The OMB Director is also directed to "consult[]" with the USDS Administrator (as well as the OPM Director) to submit a plan to reduce the size of the federal workforce.

Presidential Memorandum, Hiring Freeze, available at

https://www.whitehouse.gov/presidential-actions/2025/01/hiring-freeze/.

- The Secretary of the Treasury is also directed to "consult[]" with the USDS Administrator (as well as the OMB Director) in determining whether it is in the national interest to lift the current IRS hiring freeze. *Id.*

None of the limited responsibilities assigned to USDS—which are purely advisory and consultative in nature—can plausibly be characterized as "authority" delegated to USDS, let alone authority that is independent of the President.

That is even more clear when one compares these limited responsibilities with the significant authorities possessed by those EOP components that the D.C. Circuit has held to be FOIA agencies. *See Main Street Legal Services*, 811 F.3d at 547-48 (collecting cases). In *Soucie*, as discussed, the D.C. Circuit held that OSTP was a FOIA agency because it had independent authority "to evaluate federal scientific research programs, initiate and fund research projects, and award scholarships." *CREW v. Office of Admin*, 566 F.3d at 223 (discussing *Soucie*, 448 F.2d at 1073-75). The D.C. Circuit held that OMB was a FOIA agency because it had a statutory duty to provide budget information to Congress, along with "numerous other statutory duties." *Sierra Club v. Andrus*, 581 F.2d 895,902 (D.C. Cir. 1978), *rev'd on other grounds*, 442 U.S. 347 (1979); *see also id*. at 902 n.25 (noting OMB's authority to "assemble, correlate, revise, reduce, or increase the requests for appropriations of the several departments or establishments"). And the D.C. Circuit held that the Council on Environmental Quality ("CEQ") is a FOIA agency because it had independent authority to coordinate federal environmental regulatory programs, issue guidelines for preparing environmental impact statements, and promulgate regulations—

16

legally binding on the agencies[4]—for implementing the procedural provisions of the National Environmental Policy Act. *See Pacific Legal Foundation v. Council on Environmental Quality*, 636 F.2d 1259, 1262-63 (D.C. Cir. 1980).

USDS is nothing like those EOP components. Unlike OMB's significant statutory responsibilities, USDS has no statutory responsibilities (and indeed, no specific statutory recognition). And unlike the heads of OMB, CEQ, and OSTP, the USDS Administrator is not a position that requires Senate confirmation; indeed, it is not even a statutorily created position. *Compare Sierra Club*, 581 F.2d at 902 (noting that "Congress signified the importance of OMB's power and function, over and above its role as presidential advisor, when it provided, also by amendment in 1974, for Senate confirmation of the Director and Deputy Director of the OMB"); *see also* 42 U.S.C. § 4342 (Senate confirmation of the head of CEQ); *id*. § 6612 (same for head of OSTP). USDS has no power (unlike CEQ) to issue regulations, let alone regulations that apply throughout the executive branch. Nor does USDS have powers analogous to those OSTP has over research projects, scholarships, and scientific research programs.

### C. Plaintiff Misplaces Reliance on the *CREW v. USDS* Decision

In an effort to establish USDS's status as a FOIA agency, Plaintiff places great weight on the district court's decision in *CREW v. USDS*, __ F. Supp. 3d __, 2025 WL 752367 (D.D.C. Mar. 10, 2025), *see* Compl. ¶¶ 5, 30-37. That reliance is misplaced for several reasons.

As a threshold matter, and contrary to Plaintiff's allegation, the district court in *CREW* has not resolved the question of USDS's status under FOIA, let alone "squarely rejected" the

---

[4] *But see Marin Audubon Society v. FAA*, 121 F.4th 902, 908 (D.C. Cir. 2024) (holding that the "CEQ regulations, which purport to govern how all federal agencies must comply with the National Environmental Policy Act, are ultra vires"). We do not address the merits of that decision here.

USDS's position that it is not a FOIA agency.  Compl. ¶¶ 5, 30.  Rather, the court in that case drew a "preliminary conclusion," based substantially on "media reports," that the plaintiff had shown a likelihood of success on the question of USDS's agency status sufficient to warrant preliminary injunctive relief pending adjudication of that question.  2025 WL 752367, at *12; *see id.* at *10-12; *see also CREW v. USDS*, No. 25-cv-511 (CRC), 2025 WL 863947, at *7 (D.D.C. Mar. 19, 2025) (denying motion for reconsideration but allowing USDS to file motion for summary judgment).[5]  In any event, the *CREW* court's reasoning is unpersuasive and inconsistent with the Second Circuit's decision in *Main Street Legal Services*.

　　Plaintiff points to the *CREW* court's conclusion that "the relevant executive orders appear to endow USDS with substantial authority independent of the President."  Compl. ¶ 34 (quoting 2025 WL 752367, at *11).  But that court briefly discussed only two aspects of the multiple Executive Orders and presidential memorandum concerning USDS.  Neither establishes—nor even lends support to—the proposition that USDS is a FOIA agency.

　　First, the *CREW* court misinterpreted language in section 1 of Executive Order 14,158 stating that "the Department of Government Efficiency" was established "to implement the President's DOGE agenda."  2025 WL 752367, at *11 (citing *American Federation of Labor & Congress of Industrial Organizations v. Department of Labor*, __ F. Supp. 3d __, 2025 WL 542825, at *3 (D.D.C. Feb. 14, 2025) (USDS's agenda "is to 'implement' the President's modernization agenda, not simply to help him form it")); *see* Exec. Order 14,158, § 1.  The reference to DOGE in section 1 is not a reference to USDS in particular.  Rather, the Executive Order makes clear that the "DOGE Structure" it created "to implement" the President's "DOGE

---

[5] The defendants in the *CREW* case recently filed a petition for a writ of mandamus to quash the district court's order directing expedited discovery in that matter.  *See In re DOGE Serv. et al.*, No. 25-5130 (D.C. Cir.).  The D.C. Circuit stayed discovery pending decision on that petition.

Agenda" consists of (a) USDS, (b) the USDS Temporary Organization established within USDS, and (c) Agency DOGE Teams operating within their respective Agencies. Exec. Order 14,158, §§ 1, 3(a)-(c). According to the Executive Order, it is the Agency DOGE Teams, working with Agency heads, that take actions within Agencies to implement the President's DOGE Agenda. For its part, USDS implements the President's DOGE Agenda by providing specifically delineated recommendations and consultations, collecting specified information, and advising the President.

The *CREW* court overlooked these distinctions altogether and erroneously assumed that the general reference to "DOGE" in section 1 of the Order was a reference to "USDS." 2025 WL 752367, at *11. Apparently recognizing this, Plaintiff attempts to correct the court's error by substituting "DOGE" for "USDS" when quoting the opinion. *See* Compl. ¶¶ 34-37. But those alterations do not change the fact that under the "DOGE Structure" created by Executive Order 14,158, USDS and the USDS Temporary Organization are distinct units within the EOP, with limited responsibilities, whereas DOGE Teams operate within Agencies. Exec. Order 14,158, §§ 1, 3(a), (c).

Even putting aside the *CREW* court's misreading, the "implement" language in section 1 of Executive Order 14,158 is not evidence that USDS has been delegated substantial authority independent of the President. The phrase "to implement the President's DOGE Agenda"—even standing alone—is purely prefatory language that explains the "[p]urpose" for which the President signed the Executive Order. By itself, this language does not do anything, let alone delegate presidential authority. The National Security Council implements the President's national security agenda; the Domestic Policy Council implements the President's domestic policy agenda; and the Council of Economic Advisors implements the President's economic

agenda, but that does not make these presidential advisory bodies agencies.  Similarly, USDS implements the President's DOGE Agenda by carrying out the specific advisory and consultative roles assigned to it under Executive Order 14,158 and the other charter documents.

The *CREW* court's interpretation that the "implement" language in section 1 of Executive Order 14,158 suggests a delegation of presidential authority also runs afoul of the "cautio[us]" and "deferen[tial]" approach required under *Main Street Legal Services*, 811 F.3d at 557-58. There, the Second Circuit emphasized that "the relevant *Soucie* inquiry is not whether a unit within the Executive Office of the President can exercise some discretion in providing the President with advice and assistance," but "whether advice and assistance to the President is the unit's sole function, or whether it is empowered to exercise authority independent of the President."  811 F.3d at 558-59.  The Court found that the following responsibilities set forth in a presidential directive regarding the NSC System "manifest[ed] advice and assistance to the President, not the exercise of authority independent of him," *id.* at 559:

- Establishment of the Principals Committee as "the senior interagency forum for consideration of policy issues affecting national security," which may reach "conclusions" and "decisions";

- Establishment of the Deputies Committee to "help[] ensure that issues being brought before the Principals Committee . . . have been properly analyzed and prepared for decision"; to schedule "periodic reviews of the Administration's major foreign policy initiatives . . . to ensure that they are being implemented in a timely and effective manner"; to "consider whether existing policy directives should be revamped or rescinded"; to be "responsible for day-to-day crisis management," and to "review and monitor the work of the NSC interagency process"; and

- Establishment of the Interagency Policy Committees as "the main day-to-day fora for interagency coordination of national security policy," which "provide policy analysis for consideration by the more senior committees of the NSC system and ensure timely responses to decisions made by the President," and "review and coordinate the implementation of Presidential decisions in their policy areas."

*Id.* at 559-61.

Rather than delegating presidential authority in these areas, the Court found that the presidential directive "establish[ed] a hierarchy of interagency fora for providing the President with information and recommendations on national security issues from across the executive branch, as well as for coordinating implementation of the President's policies across government departments." *Id.* at 561. Similarly here, the limited functions set forth in USDS's charter documents—while they are in service of the broader purpose "to implement the President's DOGE Agenda"—do not constitute authority to act independent of the President, but "simply make the entity an extension of the President, a vehicle for assisting him in exercising his authority when he cannot do so in person." *Id.* at 558.

The *CREW* court also noted that "President Trump's subsequent executive order [14,210] directs that agencies 'shall not fill any vacancies for career appointments that the DOGE Team Lead assesses should not be filled, unless the Agency Head determines the positions should be filled.'" 2025 WL 752367, at *11 (quoting Exec. Order 14,210, § 3(b)(ii)). But under Executive Order 14,158, the "DOGE Team Lead" is herself an Agency employee who reports to the Agency Head or an Agency Head's designee—not to USDS. Exec. Order 14,158, § 3(c). And the fact that an Agency employee can make an assessment that an Agency head can freely countermand

is the opposite of an "authority" held by USDS—let alone an authority held by USDS that it wields independent of the President.

Plaintiff also cites the *CREW* court's reliance on excerpts of public statements by President Trump and Elon Musk, as well as media reports concerning "USDS's actions to date," which the court concluded "demonstrate its substantial authority over vast swathes of the federal government." 2025 WL 752367, at *11, *quoted in* Compl. ¶¶ 35-36. As the Second Circuit noted in *Main Street Legal Services*, however, courts should be "reluctant to locate the 'authority' indicative of agency status in action unsupported by an identified legal grant from Congress or the President." 811 F.3d at 563-64. By focusing on media reports and snippets of statements, the *CREW* court failed to exercise the "caution" and "deference" that the Second Circuit—based upon separation of powers—requires in evaluating a claim that the President has delegated his own authority to an EOP component to exercise independently. *Id.* at 557-58.

In any event, the news stories and public statements that Plaintiff cites in its complaint and that the *CREW* court discussed in its preliminary injunction opinion concern alleged activities at federal agencies, not within USDS. *See* Compl. ¶¶ 17-18, 36 (citing media reports regarding the Consumer Financial Protection Bureau ("CFPB") and the U.S. Agency for International Development ("USAID")); *see* 2025 WL 752367, at *11-12 (discussing, *inter alia*, events at USAID and the Department of Education, as well as emails sent to federal employees by OPM). To the extent Agency DOGE Teams take actions consistent with President Trump's statements, it is of course unsurprising—indeed, expected—that they are acting consistent with the President's wishes.

And while the court cited snippets of public statements by President Trump and others, *see id.* at *11, the actual statements refer to the DOGE Structure generally, rather than USDS in

particular, and many of them even predate the formation of USDS.  For example, the court stated that "[a]t its inception, President Trump trumpeted that USDS would have the power to 'to dismantle Government Bureaucracy, slash excess regulations, cut wasteful expenditures, and restructure Federal Agencies.'"  *Id.*  In fact, the cited social media post was made by President-elect Trump on November 13, 2024—more than two months before USDS was established by Executive Order 14,158—and referred not to "USDS" but to a general "Department of Government Efficiency."[6]  As discussed, the "DOGE Structure" later established by President Trump in the Executive Order assigns separate roles for USDS, the USDS Temporary Organization, and Agency DOGE Teams.  A general reference to DOGE, two months before the DOGE Structure was even created, sheds no light on the responsibilities assigned to particular units within that structure.  The same is true of the cited statements in an "opinion piece" published by Elon Musk and Vivek Ramaswamy on November 20, 2024, and in a January 9, 2025 interview of Musk.[7]  Those statements similarly refer generally to DOGE, not USDS, and they predate the Executive Order creating USDS and the DOGE Structure.

The post-inauguration statements cited by the *CREW* court also fail to show that the President has delegated to USDS his own authority to act.  That "President Trump has praised Musk and DOGE for their efforts" in locating "fake contracts" or suggesting "[c]uts" to the federal workforce,[8] does not suggest that *USDS* has been delegated authority to do either of those

---

[6] *See* Donald J. Trump (@realDonaldTrump), X (Nov. 13, 2024, 6:21 AM), https://x.com/realDonaldTrump/status/1856658569124262092.

[7] *See* https://www.wsj.com/opinion/musk-and-ramaswamy-the-doge-plan-to-reform-government-supreme-court-guidance-end-executive-power-grab-fa51c020; https://thehill.com/homenews/administration/5076095-elon-musk-doge-2t-spending-cut-goal/.

[8] *See* https://www.foxbusiness.com/media/trump-praises-real-patriot-elon-musk-opening-lot-eyes-doge.  Contrary to the quotation in the *CREW* decision, according to this article, the

things—let alone authority to be exercised independent of the President.  In fact, the Executive Orders assign those duties to Agency Heads and Agency DOGE Teams, granting USDS only an advisory, consultative role.  The *CREW* court's citation of a media report for the proposition that "[t]he President also reportedly 'ordered cabinet secretaries to cooperate with DOGE on staffing,'" leaves out the remainder of the statement:  "giving instructions to the agency leads to use a 'scalpel' when deciding which workers will remain in their jobs."[9]  The complete quote makes clear that the President was referring to Agency DOGE Teams, which under Executive Order 14,158 operate within their respective agencies, rather than USDS.

In sum, a careful review of the statements cited by the *CREW* court shows that the court repeatedly conflated "DOGE" with USDS and failed to distinguish between the distinct elements of the DOGE Structure established by Executive Order 14,158.  The court relied on snippets of statements in media reports, sometimes altered or taken out of context, many of which predated the creation of USDS.  Even assuming that such "third party reports" are appropriately considered in evaluating whether USDS has been delegated substantial authority to act independent of the President, *but see Main Street Legal Servs.*, 811 F.3d at 563-64, the *CREW* court failed to accord the "respectful measure of deference to the President's own statements"

---

President did not say that Musk "gave orders to '[c]ut 50%, 60%, 70%.'"  The President reportedly said, "What he's also done is made people realize how many people should be cut, because normally you go in, and you say, 'All right, cut 4% of your workforce.'  He said, 'Cut 50%, 60%, 70%.'  That's a big thing."  *Id.*

[9] *See* https://www.foxbusiness.com/media/trump-praises-real-patriot-elon-musk-opening-lot-eyes-doge.

that is counseled by separation of powers and required by Second Circuit law, *see id.* at 558.[10]
For all these reasons, the Court should not follow the *CREW* court's decision.

Finally, it should be noted that USDS's status as an entity that is not subject to FOIA does
not interfere with the ability of Plaintiff and other requesters to obtain records concerning agency
activities.  As the Complaint makes clear, the activities of Agency DOGE Teams have been the
subject of exhaustive media coverage.  Plaintiff is free to submit FOIA requests to the CFPB,
USAID, the Department of Education, OPM, or any other agency concerning the work of
Agency DOGE Teams.  Indeed, a conclusion that USDS is not an agency would not even mean
that all the alleged records Plaintiff seeks from USDS in this case would be beyond the reach of
FOIA.  For example, Plaintiff's second FOIA request seeks, among other records (i) all
memoranda and/or agreements that USDS has entered into with any other department, agency, or
other component of the federal executive branch, and (ii) all memoranda and/or agreements that
any other department, agency, or other component has entered into on USDS's behalf or
concerning USDS's work, since January 1, 2025.  Compl. Exh. B.  And Plaintiff's fourth FOIA
request seeks, among other records, emails exchanged between USDS Administrator Amy
Gleason and OMB Administrator Russell Vought.  Compl. Exh. D.  Any agency records
responsive to these requests that do not fall within one of FOIA's exemptions can be obtained

---

[10] The *CREW* court also stated, in a footnote, that "USDS has argued that it qualifies as an
agency—for instance, for purposes of the Economy Act—when it suits it."  2025 WL 752367, at
*12 n.3, *quoted in* Compl. ¶ 37.  But the Economy Act defines the term "agency" very differently
than FOIA, to cover even instrumentalities of the U.S. government outside the executive branch.
*See* 31 U.S.C. § 101 ("In this title, 'agency' means a department, agency, or instrumentality of
the United States Government."); *id*. § 102 (separately defining "executive agency" to mean "a
department, agency, or instrumentality in the executive branch of the United States
Government").

from the relevant agencies themselves.  But FOIA does not compel the disclosure of documents from EOP entities, like USDS, that are not agencies for purposes of the statute.

## CONCLUSION

For the foregoing reasons, Plaintiff fails to plausibly allege that USDS is an "agency" subject to FOIA, and the Court should therefore dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

Date:   New York, New York
        April 28, 2025

                                        Respectfully submitted,

                                        JAY CLAYTON
                                        United States Attorney for the
                                        Southern District of New York

                            By:    /s/ Sarah S. Normand
                                        SARAH S. NORMAND
                                        Assistant United States Attorney
                                        86 Chambers Street, 3rd Floor
                                        New York, New York 10007
                                        Tel.: (212) 637-2709
                                        sarah.normand@usdoj.gov


## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.1(c), the above-named counsel hereby certifies that this memorandum complies with the word-count limitation of this Court's Local Civil Rules. As measured by the word processing system used to prepare it, this memorandum contains 7,609 words.